IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SELECTIVE WAY INSURANCE          :          CIVIL ACTION
COMPANY                          :
                                 :
        v.                       :
                                 :
TRAVELERS PROPERTY CASUALTY      :
COMPANY OF AMERICA               :          NO. 09-1670


MEMORANDUM

McLaughlin, J.                                      July 8, 2010

        This declaratory judgment action involves an insurance

coverage dispute between the plaintiff, Selective Way Insurance

Company ("Selective Way") and the defendant, Travelers Property

and Casualty Company of America ("Travelers"), after an

automobile accident in Tunkhannock, Pennsylvania that occurred on

October 3, 2005.  The accident gave rise to a state civil

action,[1] and Selective Way, the insurer for the named defendants,

settled the lawsuit for $14.25 million.

        Selective Way filed the instant action because it

claims that Travelers had an obligation to provide a defense and

indemnity to two defendants, Keith Stalker and Stafursky Paving,

Inc. ("Stafursky Paving").  Selective Way and Travelers both move

for summary judgment.  For the reasons stated below, the Court

_____

        [1] The state action was styled Tracy Irish and John Irish v.
Dempsey Uniform and Linen Supply, Inc., James Fox, Stafursky
Paving Co., and Keith Stalker, Docket No. 314-206, and it was
initiated in Lackawanna County Court of Common Pleas in
Pennsylvania.

will grant Travelers' motion.

I.  Summary Judgment Record

        Stafursky Paving is a Pennsylvania corporation that primarily provides excavation, construction and paving services. It also provides hauling services to third-party companies. David Stafursky is the President of Stafursky Paving.  Dep. of Keith Stalker 10:1-18 ("Stalker Dep."), Ex. G to Pl.'s M.; Dep. of David Stafursky 5:3-9 ("Stafursky Dep."), Ex. H. to Pl.'s M.[2]

        At the time of the accident, Stafursky Paving had approximately ten tri-axle dump trucks, which were kept at its business address in Archibald, Pennsylvania.  The trucks were licensed in the company's name, and they were maintained and owned by Stafursky Paving.  Stalker Dep. 13:1-24; Stafursky Dep. 10:13-18.

        At the time of the accident, States Aggregate ("S.A.")[3] was a business that produced crushed stone and asphalt materials for roads.  Since approximately some time in the 1980s, S.A. would occasionally contact Stafursky Paving to haul materials. To schedule a truck for hauling, Vernon Tompkins, an employee of

---

[2] The Court cites to the parties' exhibits when referencing the summary judgment record.  The defendant also included the depositions of Mr. Stafursky and Mr. Stalker in its motion for summary judgment, as exhibits E and F, respectively.  These deposition transcripts are the same as those attached to the plaintiff's motion referenced above.

[3] States Aggregate is currently known as Eastern Industries.

S.A., would contact Stafursky Paving by telephone and request a dump truck for a specific day. S.A. would then have the truck and driver for that day for as long as necessary. Dep. of Vernon Tompkins 9:5-9, 10:23-11:24, 8:5-14, 13:19-25, 15:24-17:6 ("Tompkins Dep."), Exhibit I to Pl.'s M.

       The Friday before October 3, 2005, Mr. Stafursky spoke with Mr. Tompkins regarding hauling for an ongoing paving project. The exchange was an oral exchange, and there is no written contract memorializing the terms of the agreement. Stafursky Dep. 7:10-24, 12:3-19; Tompkins Dep. 10:23-11:24.

       Pursuant to the conversation with Mr. Tompkins, Mr. Stafursky assigned Keith Stalker, a Stafursky Paving employee, to report to the S.A. blacktop plant in Clifford, Pennsylvania on October 3, 2005, at 7 a.m. Mr. Stafursky also determined which Stafursky Paving dump truck Mr. Stalker would use. S.A. never chose the truck or the driver for its hauling projects, but, theoretically, S.A. could call Stafursky Paving if it sent a truck that was not a dump truck or sent a driver who did not perform properly. Such problems, however, had never occurred and did not occur on the day of the accident. Stafursky Dep. 7:3-8:4; Stalker Dep. 22:7-9, 19:18-20:6, 23:10-12; Tompkins Dep. 25:18-30:14.

       Mr. Stalker determined his own route to drive to the S.A. plant on October 3, 2005. When Mr. Stalker arrived at the

plant around 7 a.m., an S.A. employee told him when to load and
where he was going.  After Mr. Stalker's truck was loaded with
asphalt, he received a bill of lading with the delivery address.
Mr. Stalker was to deliver the material to a resurfacing project
on State Road 29/309.  Stalker Dep. 20:17-21:5, 23:16-25:14;
Tompkins Dep. 32:21-25, 33:14-23.

　　　　Mr. Stalker left to deliver the materials around 8:30
a.m.  When he arrived at the delivery location, he provided an
S.A. employee with the bill of lading for signing.  He then
waited his turn to dump the materials.  Any driver, including
S.A.'s own employees who performed hauling, would follow these
procedures.  Stalker Dep. 25:8-10, 26:3-9, 28:11-20; Tompkins
Dep. 33:1-13, 59:20-60:9.

　　　　After Mr. Stalker unloaded his truck, he returned to
S.A. to obtain another load to be hauled to the same location.
After delivering the second load, he returned to S.A. to obtain a
third load.  Mr. Stalker deposited the third load, and he left
the job site at 2:55 p.m., having completed the hauling for S.A.
A truck driver would know that he was done hauling if he was not
told to get another load; he would then be signed out.  Stalker
Dep. 26:13-29:23, 33:5-24, 34:6-9; Tompkins Dep. 25:14-17.

　　　　Mr. Stalker intended to drive back to Stafursky Paving
in Archibald, Pennsylvania.  In all of his driving, to the S.A.
plant, to and from the hauling points, and back to Stafursky

Paving, Mr. Stalker chose his own route.  Mr. Tompkins explained
in his deposition that S.A., as a matter of business practice,
did not designate a driver's route for hauling because the
drivers know the particular weight limit restrictions of each
road and bridge.  After repeated questions asking whether,
theoretically, Mr. Tompkins could tell a driver to take a
particular route, Mr. Tompkins responded, "Theoretically I could
tell the driver anything I wanted to."  Stalker Dep. 34:14-19,
25:25-26:2, 27:11-12, 33:1-4, 35:6-11; Tompkins Dep. 18:23-21:25.

        On his way back from the S.A. worksite to the Stafursky
Paving plant, prior to arriving there, Mr. Stalker's truck was
involved in an accident.  Stalker Dep. 35:20-22.

        Mr. Stalker did not perform any hauling for any other
company other than S.A. that day.  Mr. Stalker did not perform
any other duties for Stafursky Paving that day.  Because of the
agreement with S.A., Stafursky Paving would not have been able to
lease the truck that Mr. Stalker drove or Mr. Stalker himself to
any other person or company that day.  At the same time, Mr.
Stalker was is Stafursky Paving's dispatch, in that he could
communicate with the company through radio.  If Stafursky Paving
had another job for Mr. Stalker after he completed the hauling
for S.A., then it could have directed Mr. Stalker to the new job,
and Mr. Stalker would have complied.  Stalker Dep. 40:7-13,
38:16-39:1; Stafursky Dep. 16:13-18, 13:22-14:13, 10:4-12.

S.A. paid Stafursky Paving $6.25 per ton of material hauled. This amount accounted for all of Stafursky Paving's overhead costs for the project, including the costs of paying Mr. Stalker. Stafursky Paving provided Mr. Stalker with a weekly paycheck, from which it deducted taxes. Mr. Stalker was never paid directly by S.A. for his services. Stalker Dep. 37:11-21, 22:16-23:3, 35:17-19; Stafursky Dep. 8:20-9:1, 13:11-16, 19:7-18.

In full force and effect at the time of the accident was a commercial automobile policy issued by Travelers to the Estate of Donald B. Stabler, Q-Tip Trust and/or Stabler Companies ("Travlers policy"). Also in effect was a "Broadened Named Insured Endorsement," which modified "insured" in the Travelers policy to include "any organization, other than a partnership or joint venture, over which you maintain ownership or majority interest on the effective date of the policy." Travelers Policy, Ex. C to Pl.'s M.; Traveler's Endorsement, Ex. D to Pl.'s M.

It is undisputed that, as of the effective date of the policy, Stabler Companies maintained an ownership interest in S.A. It is also undisputed that S.A. qualified as an insured under the Travelers policy, and that S.A. was an insured on the date of the automobile accident. Pl.'s Request for Admissions, Ex. E to Pl.'s M.

With respect to business auto coverage, the Travelers policy provides:

**A.    Coverage**

> We will pay all sums an "insured" legally
> must pay as damages because of "bodily
> injury" or "property damage" to which the
> insurance applies, caused by an "accident"
> and resulting from an ownership, maintenance
> or use of a covered "auto".

Travelers Policy, Business Auto Coverage Form at 2, Ex. F to

Pl.'s M.  The policy further provides:

**1. Who Is An Insured**

> The following are "insureds":
>
> a.    You for any covered "auto".
>
> b.    Anyone else while using with your
>       permission a covered "auto" you
>       own, hire or borrow . . .
>
>              . . .
>
> c.    Anyone liable for the conduct of an
>       "insured" described above but only
>       to the extent of that liability.

Ex. F at 2.


II.  <u>Analysis</u>

Selective Way argues that both Mr. Stalker and

Stafursky Paving are insureds under the Travelers policy.  First,

it asserts that Mr. Stalker is an insured pursuant to the terms

of the policy because S.A. "hired" the truck that Mr. Stalker

used at the time of the accident, and individuals who operate

"hired autos" are insureds.  It argues that the term "hire" does

not include an element of control, but that even if the Court

finds "hire" to contain this element, then S.A. controlled and
had the right to control both Mr. Stalker and the Stafursky
Paving dump truck.

Second, it asserts that Mr. Stalker is an insured under
the policy pursuant to Pennsylvania's "borrowed servant
doctrine," where an employee of one company becomes an employee
of a second company if the second company controlled or had a
right to control the employee.  It argues that because S.A. had
the right to control Mr. Stalker and did control him, Mr. Stalker
is an insured.  It asserts that if Stalker is an insured under
either rationale, then Stafursky Paving is also an insured
because the policy covers anyone liable for the conduct of an
insured.

Travelers argues both in its motion for summary
judgment and its opposition to the plaintiff's motion for summary
judgment that Mr. Stalker did not operate a "hired auto."  It
asserts that courts evaluate whether an auto is "hired" based on
the degree of control a company exerts over the driver and
vehicle.  Because S.A. did not have control over Mr. Stalker or
the Stafursky Paving dump truck, Travelers is not liable for any
insurance coverage.  Travelers also argues that, if the Court
finds coverage under the Travelers policy, the policy's "other

insurance" clause bars any collection or indemnification.[4]

Under Rule 56 of the Federal Rules of Civil Procedure, a party moving for summary judgment must show that there is no genuine issue as to any material fact and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden then shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

The burdens of proof do not change in cases where a court is considering cross-motions for summary judgment. Peters Twp. Sch. Dist. v. Hartford Accident & Indem. Co., 833 F.2d 32, 34 (3d Cir. 1987). On cross-motions for summary judgment, the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. Pichler v. Unite, 542 F.3d 380, 386 (3d Cir. 2008).

---

[4] Travelers asserts its "other insurance" argument in its reply to its motion for summary judgment. Selective Way moved to file a surreply and argues in the brief attached to its motion that the "other insurance" clause does not alter Travelers' responsibilities of payment to Selective Way. Because the Court finds that Mr. Stalker and Stafursky Paving are not insureds under the Traveler's policy, it does not reach this issue.

A.    <u>Interpretation of the Traveler's Insurance Policy</u>

Pursuant to the Travelers policy, an insured is "anyone
. . . while using with your permission a covered 'auto' you own,
hire, or borrow."  Because the Travelers policy does not define
the term "hire," the Court must interpret its meaning.

Under Pennsylvania law,[5] an insurance policy must be
read as a whole and construed according to the plain meaning of
its terms.  <u>C. H. Heist Caribe Corp. v. Am. Home Assurance Co.</u>,
640 F.2d 479, 481 (3d Cir. 1981).  Words of common usage in an
insurance policy are to be construed in their natural, plain, and
ordinary sense, and courts may inform their understanding of such
words by consulting a dictionary.  <u>Madison Constr. Co. v.
Harleysville Mut. Ins. Co.</u>, 735 A.2d 100, 108 (Pa. 1999).
Ambiguous terms in a contract are to be construed in favor of the
insured and against the insurer.  <u>Bateman v. Motorists Mut. Ins.
Co.</u>, 590 A.2d 281, 283 (Pa. 1991).[6]  Courts, however, should not
read ambiguity into contracts.  <u>Madison Constr. Co.</u>, 735 A.2d at
106 ("We will not, however, distort the meaning of the language
or resort to a strained contrivance in order to find an
ambiguity.").  Contractual language is ambiguous only "if it is

_____

[5] Both parties submit that Pennsylvania law controls this
action.

[6] The presumption against the insurer applies even when the
parties in an action are two insurance companies.  <u>Pa. Nat'l Mut.
Cas. Ins. Co. v. Traveler's Ins. Co.</u>, 592 A.2d 51, 53-54 (Pa.
Super. Ct. 1991).

reasonably susceptible of different constructions and capable of being understood in more than one sense."  Hutchison v. Sunbeam Coal Co., 519 A.2d 385, 390 (Pa. 1986).

The plaintiff asserts that the Court should look to dictionaries to determine the meaning of "hire," and that none of the definitions contain explicitly the word "control."  It also argues that the term "hire" is ambiguous because it is not defined in the Travelers policy.  It should be construed against Travelers, the drafter, and not found to contain an element of control.

The plaintiff's arguments fail.  First, although dictionaries may not use the word "control" when defining "hire," and Pennsylvania courts have provided little guidance in interpreting the term, the Court finds that the term "hire" contains an element of control.  According to the Oxford English Dictionary, the term "hire" means: "To procure the temporary use of (any thing) for stipulated payment."  Oxford English Dictionary (2d ed. 1989).  The Merriam-Webster Dictionary provides: "To engage the temporary use of for a fixed sum."  Webster's Third New Int'l Dictionary (1997).  To use something requires a degree of control.  As explained in a treatise on insurance, "[T]he key inquiry regarding whether an automobile will fall within the hired automobiles provision of the policy is whether the insured exercised dominion, control or the right to

direct the use of the vehicle."  Lee R. Russ & Thomas F. Segalla,

COUCH ON INSURANCE § 118.46, at 118-74 (3d ed. 1997) (quoted in

Holmes v. Brethren Mut. Ins. Co., 868 A.2d 155, 158 (D.C. Ct.

App. 2005)).

          The majority of courts that apply the plain meaning of

"hire" when interpreting policies like the one at issue have

found the term to contain an element of control.  E.g., U.S. Fid.

& Guar. Co. v. Heritage Mut. Ins. Co., 230 F.3d 331, 333-35 (7th

Cir. 2000);[7] (evaluating "hired auto" under Indiana law based on

plain meaning of term and amount of control when one company was

hauling materials for another company); Chicago Ins. Co. v. Farm

Bureau Mut. Ins. Co., 929 F.2d 372, 374-75 (8th Cir. 1991)

(evaluating control to determine whether company was an

independent contractor or "hired auto"); Wolverine Ins. Co. v.

State Auto. Mut. Ins. Co., 415 F.2d 1182, 1184 (6th Cir. 1969)

("The right to control of equipment is generally regarded as the

critical distinction between the 'hired automobile' and the

'nonowned automobile' for insurance contract purposes."); Earth

Tech, Inc. v. U.S. Fire Ins. Co., 407 F. Supp. 2d 763, 771-73

(E.D. Va. 2006) (evaluating "hired auto" under Virginia law based

---

          [7] Although Indiana, unlike Pennsylvania, law does not
require courts to construe ambiguous terms against an insurer
when the parties in a matter are two insurance companies, the
court in U.S. Fidelity did not rely on this aspect of Indiana law
in reaching its decision because it found the term "hire"
unambiguous.  U.S. Fid., 230 F.3d at 333.

on degree of control); <u>Occidental Fire & Cas. Co. v. Westport</u>
<u>Ins. Corp.</u>, No. 02-8923, 2004 WL 2028616, at *5-9 (E.D. Pa. Sept.
10, 2004) (evaluating "hired auto" under Pennsylvania law based
on dictionary definition and amount of control when one company
subcontracted with another company for hauling).

The plaintiff cites to only one case, <u>Pawtucket Mutual</u>
<u>Insurance Company v. Hartford Insurance Company</u>, 787 A.2d 870
(N.H. 2001), where a court did not consider control when
determining whether a car was a "hired auto" for insurance policy
purposes. <u>Pawtucket</u>, however, did not involve a hauling
scenario, unlike the above-referenced cases. Further, courts
note that <u>Pawtucket</u> is known for its "distinctly minority view"
with respect to this issue. <u>Holmes</u>, 868 A.2d at 158 n.3; <u>see</u>
<u>Earth Tech</u>, 407 F. Supp. 2d at 771-72 & n.13.

Second, the Court does not find the term "hire" to be
ambiguous, such that it should be construed against Travelers. A
term is not ambiguous under Pennsylvania law simply because it is
undefined; it is ambiguous when it is susceptible to two
different meanings. <u>Hutchison</u>, 519 A.2d at 390. Courts should
not distort the meaning of a word to find an ambiguity. <u>Madison</u>
<u>Constr. Co.</u>, 735 A.2d at 106. Further, a finding of ambiguity
would not require the Court to ignore the element of control
because courts have still considered the degree of control upon
holding that the term "hire" is ambiguous. <u>E.g.</u>, <u>Kresse v. Home</u>

13

Ins. Co., 765 F.2d 753, 755-56 (8th Cir. 1985) (finding "hire" ambiguous, then evaluating term based on degree of control); Toops v. Gulf Coast Marine Inc., 72 F.3d 483, 486-87 (5th Cir. 1996) (holding contract should be construed against insurer and evaluating "hired auto" through degree of control).

      B.    Whether S.A. "Hired" the Stafursky Paving Truck

      Courts evaluating "hired auto" clauses in the hauling context look to a variety of factors to determine whether a company in S.A.'s position had control, such that the auto was "hired." They consider the degree of control exerted over the vehicle, driver, and route, and note that minimal levels of control do not render an auto "hired."

      In United States Fidelity & Guaranty Company v. Heritage Mutual Insurance Company, 230 F.3d 331, the Court of Appeals for the Seventh Circuit evaluated whether Irving Materials, Inc. ("IMI") hired a truck owned by V&S Transport, Inc. ("V&S") after an employee of V&S was involved in an accident while hauling materials for IMI. The insurance companies for IMI and V&S filed cross-motions for summary judgment, and the Court of Appeals affirmed the district court's finding that the truck was not a "hired auto" because: (1) V&S maintained its trucks and provided gas for them, (2) V&S paid the drivers and provided their benefits, and (3) IMI did not dictate the routes the drivers took. Although IMI directed the driver to particular

14

locations, it could tell V&S not to send a particular driver, and the driver worked for as long as IMI had loads, the court found this evidence of control insufficient to make the truck a "hired auto."

The Court of Appeals for the Eighth Circuit evaluated these factors in <u>Kresse v. Home Insurance Company</u>, 765 F.2d 758, to reach the opposite result. Clarence Kresse's driver was involved in an accident while hauling for Cass County, and Mr. Kresse's insurance company sought a declaration of insurance coverage. The Court of Appeals determined that there were genuine issues of material fact as to whether Cass County "hired" the auto involved in the accident because: (1) the parties had a written contract that referred to the trucks as "hired trucks"; (2) the county determined the route to be used, and it could dismiss drivers who deviated from it; (3) the county determined specific hours of operation; and (4) there was evidence that the county hired specific trucks.

One court in this district evaluated a "hired auto" clause in an insurance policy under Pennsylvania law and found these same factors relevant. In <u>Occidental Fire and Casualty Company v. Westport Insurance Company</u>, 2004 WL 2028616, B.K. Leasing Company, Inc. ("B.K.") had a verbal contract with F.O. Transport, Inc. ("F.O.T.") to transport cargo when B.K. did not have enough equipment or personnel to transport the cargo

itself.[8]  An F.O.T. driver was involved in an accident while

hauling for B.K., and the insurance companies sought declarations

of their coverage responsibilities.  The court held that B.K. did

not "hire" F.O.T. because: (1) B.K. did not determine the route

that F.O.T. drivers took when hauling, (2) B.K. did not assign

the drivers or tell the drivers how to maintain the trucks, and

(3) B.K. did not choose a specific truck to be used.  Although

B.K. exerted limited control, in that it could instruct F.O.T. to

not use certain drivers, it determined the number of loads

transported, and it told F.O.T. where and when to load, this

control was insufficient to demonstrate that B.K. hired the

trucks.  See also Chicago Ins. Co., 929 F.2d at 374 (evaluating

same factors); Earth Tech, 407 F. Supp. 2d at 771-73 (same).

Upon consideration of the factors used by courts to

determine whether an auto is "hired," the Court finds that the

Stafursky Paving vehicle was not a "hired auto" for purposes of

the Travelers policy.

---

[8] Occidental provided a slightly different fact pattern than
the present matter.  It involved a company with goods that hired
a hauling company that subcontracted with another hauling company
whose driver caused an accident, resulting in an insurance
dispute between the two hauling companies.  The present matter,
however, involves S.A., a company with goods, that used a hauling
company, Stafursky Paving, whose driver caused an accident.  The
Court finds this distinction immaterial.  It did not have a
bearing on the holding of Occidental, and no courts have found
the distinction meaningful.  E.g., U.S. Fid., 230 F.3d at 334
(citing to subcontractor case even though fact pattern at issue
did not involve subcontractors).

###### 1. Vehicle

It is undisputed that Stafursky Paving maintained all of the vehicles used for hauling.  The vehicles were licensed in its name, and the company owned them.  It is also undisputed that Stafursky Paving assigned the trucks to be used for hauling, and that Mr. Stafursky chose the truck for the S.A. project.

The plaintiff argues that S.A. had control over the truck because if Stafursky Paving did not send a dump truck, S.A. could get a replacement.  Such a fact does not demonstrate control over the truck, or demonstrate that S.A. had the right to choose a specific dump truck for its hauling needs.  E.g., Kresse, 765 F.2d at 756 (finding that choosing a specific dump truck to be used for the entire hauling season as evidence of control); Earth Tech, 407 F. Supp. 2d at 773 (finding that choosing the type of truck, but not a specific truck within that type not an indicia of control).

###### 2. Driver

Analysis of the control over the driver also demonstrates that S.A. did not "hire" the dump truck.  It is undisputed that Mr. Stafursky chose which driver would perform a specific hauling project, and that Mr. Stafursky chose Mr. Stalker to perform for S.A.  Also, Mr. Stalker was employed by Stafursky Paving at all times.  He received a weekly pay check from Stafursky Paving from which taxes were deducted, and he was

17

never paid by S.A.

The plaintiff argues that S.A. could exert control over Mr. Stalker because Mr. Stalker could not abandon the S.A. project while he was hauling, demonstrating that S.A. had exclusive control over him. Also, hypothetically, S.A. could tell Stafursky Paving that it did not like a driver who did not perform properly, and S.A. "paid" Mr. Stalker to the extent that the cost per ton of hauling included the cost of the driver.

These points are uncompelling. First, Mr. Stalker was under Stafursky Paving's dispatch during the entire hauling project, and it could have sent Mr. Stalker to a different hauling job once the S.A. job was complete. Second, courts have found that the ability to dismiss or the actual dismissal of drivers is insufficient to demonstrate control. E.g., U.S. Fid., 230 F.3d at 333, 335; Chicago Ins. Co., 929 F.2d at 374; Occidental, 2204 WL 2028616, at *7. Third, the payment per ton for the hauling included all of Stafursky Paving's overhead costs, and not just the costs of paying Mr. Stalker.

The plaintiff also argues that S.A. exerted control over Mr. Stalker because S.A. employees told Mr. Stalker where and when to load and unload the cargo, and it provided Mr. Stalker with a bill of lading to be handed over upon arrival at the dump site. S.A. employees who provided hauling for S.A. would also follow these procedures, indicating that S.A. exerted

18

the same degree of control over Mr. Stalker as it did over its own employees.

Although such facts may be an indication of minimal control, they are insufficient to render the truck a "hired auto." S.A. did not tell Mr. Stalker how to operate his vehicle, nor did it provide specific instructions for how to load and unload. S.A. was only concerned with the result of the transportation from point A to Point B, and it gave minimal direction to Mr. Stalker for completing this task. See, e.g., Toops, 72 F.3d at 487; Earth Tech, 407 F. Supp. 2d at 773; Occidental, 2004 WL 2028616, at *7.

Further, although S.A. employees hauling for S.A. would perform the same procedures, in the case of an S.A. employee, other factors reflecting control, which are absent here, would be present. In such a scenario, the employee would use a truck that S.A. owned, maintained, and licensed; he would receive a paycheck from S.A.; and he would remain in S.A.'s dispatch.

### 3. Route

Mr. Stalker stated that he chose all of his driving routes on the day of the accident: he chose his route to the S.A. plant, to and from the plant and the depositing location, and back from the depositing location to Stafursky Paving. Mr. Tompkins explained that he would never tell a driver what route to use for hauling because the drivers "know what roads, they

19

know the bridges, they know the weight limit that I don't keep track of."  Tompkins Dep. 19:13-15.

The plaintiff claims that S.A. controlled the route because, during a line of questioning asking whether S.A. could theoretically tell a driver what route to take, where Mr. Tompkins continued to explain that he would not dictate this aspect of hauling, Mr. Tompkins eventually stated, "Theoretically, I could tell the driver anything I wanted to." The plaintiff cites to this statement for the propositions that "if [S.A.] directed a driver to take a particular route, the driver would be required to take that route," and that S.A. "retained the right to control virtually every aspect of a hired truck and driver."  Pl.'s Opp. 7; see also Pl.'s Opp. 18-20.

The record does not support the plaintiff's claim, and no reasonable jury could interpret Mr. Tompkins's statement to mean that S.A. controlled every aspect of hauling.  Not only did Mr. Tompkins explain that S.A. never dictated the routes for drivers, and that a specific route was never a condition for hauling, but he stated later in his deposition that he would have no ability to enforce such a hypothetical command.  Tompkins Dep. 44:11-15. Contra Kresse, 765 F.2d at 755 (finding ability to fire driver who deviated from specific route an indicia of control).

The plaintiff then argues in the alternative that the Court should not consider control over the route to be a factor

because S.A. did not dictate the route for any haulers, including its own employees who hauled materials.  It is incongruous to find this factor neutral simply because S.A. never controlled a driver's route.  Rather, this fact demonstrates that S.A. never exerted control over a route, including that taken by Mr. Stalker.

C.    The "Borrowed Servant Doctrine"

The plaintiff argues that Mr. Stalker, and therefore Stafursky Paving, are insureds under the Travelers policy not only under the terms of the policy itself, but also under the "borrowed servant doctrine."  This doctrine provides that "one who is in the general employ of one employer may be transferred to the service of another in such a manner that the employee becomes an employee of the second employer."  Virtue v. Square D Co., 887 F. Supp. 98, 100-01 (M.D. Pa. 1995).  The plaintiff argues that Mr. Stalker was an employee of S.A. under the borrowed servant doctrine, making him and Stafursky Paving insureds.

The borrowed servant doctrine applies when an employee passes under the control from one employer to another.  Wilkinson v. K-Mart, 603 A.2d 659, 661 (Pa. Super. Ct. 1992).  The determination is based on the right to control the employee, and not on the actual control exerted.  Id. at 661.  Relevant factors in the hauling context include whether the alleged employer had

21

the right to dispatch and direct the driver, select routes, and direct day-to-day operations of the vehicle, and whether it owned the vehicle at issue.  <u>See</u> <u>id.</u>

The plaintiff's arguments with respect to the borrowed servant doctrine replicate those from its "hired auto" analysis. Pl.'s Opp. 19 n.5 & 23-24; Pl.'s M. 29-30.  For the reasons stated in the previous section, the Court finds that S.A. did not have sufficient control over Mr. Stalker to make him a "borrowed servant."[9]

    D.   <u>"Other Insurance"</u>

The Court does not reach the defendant's argument that the "other insurance" clause within the Travelers policy bars collection and indemnification.  Because it finds that Mr. Stalker and Stafursky Paving are not insureds under the Travlers policy, the "other insurance" issue is moot.

## III. <u>Conclusion</u>

For the reasons herein stated, the Court grants summary judgment for the defendant.  There is no genuine issue of material fact as to whether Mr. Stalker and Stafursky Paving are

---

[9] The Court acknowledges that consideration of which employer actually hired the employee and paid the employee's wages are not relevant under the borrowed servant doctrine. <u>Wilkinson</u>, 603 A.2d at 661.  Putting such considerations aside, the Court still finds that S.A. did not have the requisite control to render Mr. Stalker a borrowed servant.

insureds under the Travlers policy.  An appropriate order shall issue separately.